UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE GREENE TURTLE FRANCHISING CORPORATION, and GEO O. CONCEPCION, <br><br> Plaintiffs, <br><br> -against- <br><br> LENDBUG LLC, AMIR MEIRI, TODAY'S ADVANCE, AND DAVID STEELE, <br><br> Defendants. | Case No.: 1:25-cv-10682 |

## <u>COMPLAINT</u>

Plaintiffs The Greene Turtle Franchising, Corp. (the "Greene Turtle") and Geo O. Concepcion (collectively, "Plaintiffs"), by and through their attorneys, Heskin & Proper, PLLC, allege as against Defendants Lendbug, LLC, Amir Meiri, Today's Advance ("Today's Advance") and David Steele (collectively, "Defendants"), upon knowledge as to their own actions, and upon information and belief as to all other matters:

## <u>NATURE OF THE ACTION</u>

1.      This action seeks damages and injunctive relief arising out of a fraudulent and extortionate loansharking scheme perpetrated by Defendants.

### The Lendbug/Meiri Scheme

2.      The Lendbug scheme is led by Defendant Amir Meiri, who was recently convicted in this Court for conspiracy to commit federal wire and bank fraud arising out of a similar fraudulent lending scheme.  Specifically, Meiri pled guilty to a fraudulent scheme to fraudulently induce distressed borrowers to sell their homes for little or no consideration to a

company he and his father owned or controlled.  To induce these distressed borrowers into the scheme, Meiri fraudulently represented that he could save their homes through loan modifications.  *See* Ex. 1.

3.    Meiri was sentenced to sixty days in jail and was released on supervised release in December 2021.

4.    While on supervised release for a conviction entered by this Court, Muir engaged in yet another fraudulent scheme to similarly defraud distressed borrowers in violation of this state's criminal usury laws.

5.    The scheme was apparently inspired by Bloomberg News' exposure of a predatory lending scheme using Connecticut's prejudgment attachment statute, which was employed by another notorious New York loan shark Jonathan Braun.

6.    On February 10, 2022, Bloomberg News exposed this new tactic being abused by the predatory MCA industry.  *See* https://www.bloomberg.com/news/features/2022-02-10/predatory-lenders-are-using-legal-tricks-to-freeze-borrowers-bank-accounts?embedded-checkout=true

7.    Specifically, Meiri lives and operates out of New York but abuses an apparent loophole under Connecticut procedural law to collect upon his unlawful debts.

8.    In doing so, Meiri freezes out-of-state bank accounts by simply serving legal papers (which have not been reviewed or scrutinized by any court) on a bank that has a branch located in Connecticut.  As justification for his bank freezes, Meiri directs one of his agents to represent and attest under oath that his small business victims owe him a debt and that Meiri is unaware of any defenses to their claims.

9.      He also knowingly and intentionally falsely represents to those courts through his agents that his principal place of business is located in Connecticut.  It is not and all one has to do is review the Affidavit of Debt, which was signed by a notary located in Brooklyn, New York.  *See* Ex. 2.

10.      According to Bloomberg News, this Connecticut loophole was used more than 180 times in 2021.  The result of this tactic is often catastrophic because predatory lenders can freeze out-of-state bank accounts without any notice whatsoever.  Once frozen, these predatory lenders can then extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

11.      This tactic is especially harsh because even when the small business victim capitulates to their extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

12.      As a direct result of these abuses, the Connecticut Legislature amended the statute to curb these abuses. *See https://debanked.com/2025/02/connecticut-introduces-bill-on-ex-parte-prejudgment-remedies-for-mcas/*

13.      Despite these amendments, Meiri continues to use this unlawful and extortionate tactic in an attempt to force Plaintiffs and others to pay on his criminally usurious loans, which is a Class D felony in both New York and Connecticut.

14.      In an attempt to disguise his criminally usurious loans, Meiri labels his criminally usurious loans as Purchases and Sales of Receivables. *See* Ex. 3 (Lendbug Loans).

15.      As judicially admitted in a filing he made in Maryland to further this extortionate loansharking scheme, Meiri through his company Lendbug admitted that the true nature of the

transaction is a loan.  *See* Ex. 4, Complaint ("35. Plaintiff and GT Corp entered into a Future Receivables Sale and Purchase Agreement ("First Agreement"), ***wherein Plaintiff agreed to provide a <u>loan</u> to GT Corp***.").

16.     The loans at issue charge an interest rate exceeding 300% and thus violate the criminal laws of both New York and Connecticut.  *See* N.Y. Penal Law § 190.40 and Conn. Gen. Stat. § 37-4; Ex. 3 (Lendbug Loans).

17.     In addition to freezing Plaintiffs' main operating account, Meiri also served UCC restraints on Plaintiffs' credit card processers and sent UCC-9 restraint letters on customers, lawyers and vendors in a further attempt to extort.  *See, e.g,* Ex. 5.

18.     Meiri has refused to release these accounts despite knowing that he has violated the senior UCC rights of others, and that surrendering to Meiri's demand would cause even more damage to Plaintiffs' operations.

19.     Meiri has been repeatedly advised of these unlawful and extortionate acts but he will not relent unless he is paid his criminally usurious interest.

20.     To this day, Meiri continues to hold Plaintiffs' operating account and credit card processors hostage unless Plaintiffs capitulate.

21.     Meiri has preyed on Plaintiffs since April 2024, advancing a total of $2,452,685 and collecting $3,117,208 for total usurious interest of at least $664,523.

**The Today's Advance Scheme**

22.     Today's Advance is fictitious name used by Steele.

23.     Today's Advance has a website of todaysadvance.com and a phone number of (929) 282-4863.

24.     It is not registered to do business in New York or registered as a domestic corporation.

25.     Today's Advance is a loan broker who targets businesses that have already entered into predatory loans.

26.     Today's Advance makes a commission by selling businesses predatory loans, typically between 10-15% of the advanced amount.

27.     In soliciting and inducing Plaintiffs into entering each of the Lendbug Loans, Today's Advance failed to advise Plaintiffs that its commission depended on the interest rate obtained, meaning the higher the interest rate paid by Plaintiffs, the more Today's Advance made on its commission.

28.     Today's Advance knew that the loans it induced Plaintiffs to enter into were criminally usurious, and on information and belief, Today's Advance knew of Meiri's criminal background but never disclosed it to Plaintiffs.

29.     Among other reasons, Today's Advance knew that the transactions were not true sales of receivables because it obtained a copy of Plaintiffs' bank statements showing that Plaintiffs had already entered into numerous other MCA agreements with other MCA companies.

30.     As a broker familiar with the MCA industry, Today's Advance knew or should have known that the transactions were illegal.

31.     Today's Advance further knew or should have known that it was inducing Plaintiffs to enter transactions that placed Plaintiffs in breach from day one because each and every one of the Lendbug Loans contains a representation and warranty that it has clear title to all of its future receivables.

32.     The existence of this breach from day one renders the transactions criminally usurious loans as a matter of well settled New York law.  *See People v. Richmond Capital Group LLC*, 2023 N.Y. Misc. LEXIS 5511, *7-8, 2023 NY Slip Op 50975(U), 4, 80 Misc. 3d 1213(A), 195 N.Y.S.3d 637, 2023 WL 6053768 ("The Predatory Lenders made sure that their Borrowers were in default on Day 1 of the MCAs by requiring that the Borrowers falsely represent that the collateral (*i.e.*, the accounts receivable) was free and clear of all other loans (*see, e.g.*, NYSCEF Doc. No. 8, § 2.10) and that they would not pledge those assets to others (*id.*, at 6). The Predatory Lenders knew this was false (NYSCEF Doc. Nos. 136, 699). The Predatory Lenders knew that their money was behind other lenders as to the pledged accounts receivable (NYSCEF Doc. No. 150, at 4 ["I care about 110 days *in 5th or 6th*"] [emphasis added]). The Addendum to the MCAs also makes clear that a few missed payments constitute a default (*see, e.g.*, NYSCEF Doc. No. 8, at 9 ["**NSF Fee Standard** - $50.00 (each) up to **THREE TIMES ONLY** before a default is declared"] [emphasis in original]; *see also* NYSCEF Doc. No. 699). Additionally, Section 2.9 of the MCAs makes clear that any encumbrance of the collateral would make the full amount immediately due and payable and that the Predatory Lenders could enforce the personal guaranties that they required the Borrowers to provide.").

33.     By inducing Plaintiffs into entering each of these illegal loans, Today's Advance knowingly conspired with Lendbug to collect upon unlawful debt under the RICO statute.  It also engaged in fraud by knowingly concealing the true nature of the transaction.

34.     Defendants' conduct constitutes the collection of "unlawful debt" as defined in 18 U.S.C. § 1961(6), because the alleged MCA obligations were criminally incurred in connection with Defendants' business of lending money at usurious rates, unenforceable under state usury

law and carried interest rates at least twice the maximum enforceable rate under New York and Connecticut law.

35.    Plaintiffs, as a direct and proximate result of Defendants' misconduct, incurred financial harm and was subjected to unlawful and coercive payment demands, creating risk of non-compensable harm.

36.    Defendants' actions constitute a pattern of racketeering activity and/or the collection of unlawful debt in violation of RICO, including through the use of interstate wires and electronic banking systems to solicit, document, fund, and collect the unlawful obligations.

37.    This Complaint seeks damages and equitable relief under RICO, 18 U.S.C. §§ 1961 et seq., declaratory relief under 28 U.S.C. § 2201, and damages under New York law for breach of fiduciary duty and negligence.

## THE PARTIES

38.    Plaintiff Greene Turtle Franchising is a corporation organized in the State of Maryland, with its principal place of business located in Maryland.

39.    Plaintiff Geo O. Concepcion is a natural person and a citizen of the State of Maryland.

40.    Defendant Amir Meiri is an individual citizen residing in Brooklyn, New York.

41.    Defendant Lendbug is a limited liability company with a purported address of 1266 E Main St #700R. Stamford, CT 06902.  Meiri is the sole LLC member.

42.    On information and belief, Defendant Steele is an individual citizen residing in New York.

43.    On information and belief, Defendant Today's Advance is a New York entity with an address located at 3550 Riverside Dr., Oceanside, NY 11572.

## JURISDICTION AND VENUE

44.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (including claims based on the collection of unlawful debt), as well as the civil-remedy provision of RICO, 18 U.S.C. § 1964(c)

45.    This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) (Diversity of Citizenship) because this case is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

46.    This Court has supplemental jurisdiction over Plaintiffs' related state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as the federal RICO claims.

47.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including (among other things) Defendants' solicitation and contracting activity directed into New York, their use of New York forum and governing-law provisions, and their collection efforts directed at Plaintiffs in New York.

48.    Venue is also proper because at least one of the individual defendants resides within District, and because at least one of the defendants, Meiri, has a related case within this District, which may be impacted by the relief sought in this action.  In particular, to the extent that Defendant Meiri owes restitution to his victims in *United States v. Alvarenga* (1:15-cr-00627), any payment made to Meiri may be subject to restitution judgments in that case.  *See, e.g.,* ECF #815 ("LETTER MOTION addressed to Judge Edgardo Ramos from Sheb Swett dated September 7, 2021 re: Restitution . Document filed by USA as to Amir Meiri, Samantha

Boubert, Christine Maharaj, Owen Reid, Herzel Meiri. (Attachments: # 1 Proposed

Order)(Swett, Sebastian) (Entered: 09/07/2021)").

49.     This Court has personal jurisdiction over each Defendant because each Defendant

transacts business in New York, including within the Southern District of New York; committed

tortious acts in New York and/or directed tortious acts into New York causing injury within this

State; and purposefully availed themselves of the privilege of conducting activities in New York

and of the benefits and protections of its laws, such that the exercise of jurisdiction over them in

this forum is consistent with due process.

## COMMON FACTUAL ALLEGATIONS

**A.      The Predatory MCA Industry.**

50.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest

MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an

inspirational character for the movie "Boiler Room."

51.     As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade

someone to take money than to spend it buying stock."

52.     Just like in the movie, MCA companies utilize high-pressure boiler room tactics,

employing salespersons with no financial background whatsoever.

53.     As Bloomberg previously reported, the MCA Industry is "essentially payday

lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times

higher than a bank's."

54.     The MCA Industry is a breeding ground for "brokers convicted of stock scams,

insider trading, embezzlement, gambling, and dealing ecstasy." Id.

55.    As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.

56.    There's no license you need to file for.

57.    It's pretty much unregulated."  Id.

**B.    The Sham.**

35.    Many states, like New York, have laws prohibiting predatory interest rates.

36.    In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables."

37.    MCA companies, rather than making loans to merchants, promote a fiction that they are purchasing at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts.

38.    The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables.

39.    But the picture they paint is contrary to reality.

40.    By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences, as well as collect receivables from their customers that MCA companies supposedly purchased.

**C.    The Bloomberg Awakening.**

41.    For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners.

42.     That all changed on November 20, 2018, when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.

43.     As a direct result of the light shone on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

44.     Congress also took notice on June 26, 2019, when the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: The Small Business Story."

45.     As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.

46.     Regulators have also acted, when on July 31, 2020, the New York Attorney General sued a group of MCA companies, as well as their principals, alleging that their MCA Agreements constitute criminally usurious loans.

47.     On July 31, 2020, the Securities and Exchange Commission shut down an MCA Greene Turtle.

48.     In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."

49.     The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.

50.     On June 10, 2020, the Federal Trade Commission filed a complaint against John Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs.

51.     On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.

52.     Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them."

53.     On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA Agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA Greene Turtle from doing business in California unless and until it complies with its laws.

54.     On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."

55.     On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."

56.     As Gretchen Morgensen of NBC News reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19. *See* https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167

57.     The New York Attorney General has also cracked down on the MCA industry, filing two enforcement actions against various predatory MCA Lenders, obtaining judgments exceeding one billion dollars. *See* https://ag.ny.gov/resources/individuals/credit-debt-lending/yellowstone-settlement; https://ag.ny.gov/press-release/2024/attorney-general-james-announces-historic-judgment-against-predatory-lender

**D.      The MCA Agreements are Substantively and Procedurally Unconscionable.**

58.     The MCA Agreements are unconscionable contracts of adhesion that are not negotiated at arm's-length.

59.     Instead, the MCA Agreements contain one-sided terms that prey upon merchants and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

60.     Among these one-sided terms, the MCA Agreements include: (1) a provision giving the MCA the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the MCA, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA's attorneys' fees but not the other way around, (4) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (5) a personal guarantee, the revocation of which is an event of default, (6) a

jury trial waiver, (7) a class action waiver, (8) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (9) a prohibition of obtaining financing from other sources, (10) the maintenance of business interruption insurance, (11) an assignment of lease of merchant's premises in favor of the MCA, (12) the right to direct all credit card processing payments to the MCA, (13) a power-of-attorney to settle all obligations due to the MCA and (14) a power of attorney authorizing the MCA to "file any claims or taken any action or institute any proceeding…"

61.     The MCA Agreements are also unconscionable because they contain numerous knowingly false statements.

62.     Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA to charge an exorbitant ACH Program Fee or Origination Fee.

63.     The MCA Agreements are also unconscionable because they impose repayment structures that are economically unsustainable for operating businesses.

64.     Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse change, financial or otherwise, in such condition, operation or ownership of Merchant.

65.     The MCA Agreements also contain numerous improper penalties that violate New York's strong public policy.

66.     Among these improper penalties, the MCA Agreements (1) entitle the MCA to attorneys' fees, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all its receivables if it misses just one fixed daily payment.

67.     The Daily Payments under each of the MCA Agreements described below were fixed and absolute and each of the agreements' reconciliation provisions were a sham.

68.     Defendants did not maintain reconciliation departments and did not have any one trained or otherwise dedicated to performing any reconciliation of a merchant's accounts.

69.     Indeed, the MCA Agreements did not contain any functioning contact information whereby Plaintiffs could even request a reconciliation within the terms of that provision.

70.     The terms of the reconciliation provisions further reveal the sham.

**E.     Defendants Disguised the True Nature of the Transaction.**

71.     Despite the documented form, the Transaction is, in economic reality, a loan that is absolutely repayable. Among other hallmarks of a loan:

(a) The Daily Payments were fixed, and the so-called reconciliation provision was mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time.

(b) The default and remedy provisions purported to hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans sought to obligate the merchants to ensure sufficient funds were maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants were in default and, upon default, the outstanding balance of the Purchased Amount became immediately due and owing.

(c) While the agreements purport to "assign" all the merchant's future account receivables to the Enterprise until the Purchased Amount was paid, the merchants retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof.  Indeed, rather

than purchasing receivables, the Enterprise merely acquired a security interest in the merchant's accounts to secure payment of the Purchased Amount.

(d) The transaction was underwritten based upon an assessment of the merchant's credit worthiness, not the creditworthiness of any account debtor.

(e) The Purchased Amount was not calculated based upon the fair market value of the merchant's future receivables but rather was unilaterally dictated by the Enterprise based upon the interest rate it wanted to be paid. As part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value.

(f) The amount of the Daily Payments was determined based upon when the Enterprise wanted to be paid and not based upon any good-faith estimate of the merchant's future account receivables.

(g) The Enterprise assumed no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constituted a default under the agreements.

(h) The Enterprise required the merchants to undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the Greene Turtle would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i) The Enterprise required that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew were breached from day one.

71.    Following the exposure of MCA practices in federal enforcement actions and media reports on "boiler room" operations, companies such as Defendants, and their affiliates, continued to operate as high-interest lenders masquerading as "funders." Their operations are

often aided by ISO brokers, who act as unregistered middlemen compensated by commissions per transaction rather than by legitimate service.

## RICO ALLEGATIONS

97.     Defendants are associated together for a common purpose: to solicit merchants seeking working-capital financing with "consolidation" pitches, paper unlawful loans as purported receivables purchases, extract outsized broker/origination fees, and collect unlawful debt through fixed remittances and coercive enforcement.

98.     The association-in-fact enterprise (the "Enterprise") had an ongoing structure, including coordinated solicitation (broker), standardized contract documentation (lender), shared financial incentives (fees and yield), and collection mechanisms (scheduled remittances and enforcement).

99.     The Enterprise operated through a division of labor. Today's Advance functioned as the Enterprise's solicitation and placement arm: it generated leads, marketed and pitched purported "consolidation" financing, collected merchant financial materials, and funneled merchants seeking working-capital financing to Lendbug for funding under standardized "receivables purchase" paperwork.

100.     Lendbug functioned as the Enterprise's funding and documentation arm: it provided the capital, drafted and supplied standardized form agreements and authorizations, imposed fixed remittance schedules and default remedies, and collected payments through scheduled electronic withdrawals and enforcement mechanisms.

101.     Meiri functioned as a directing and supervisory participant in each Enterprise by overseeing and directing, directly or indirectly, the funding, documentation, and collection

practices used to originate, service, and collect upon the unlawful obligations, including through standardized forms and scheduled electronic debits.

102.    Today's Advance brokerage services were not ancillary or incidental. Today's Advance was an integral participant in the Enterprise's operation because it was the front-end channel through which merchants were solicited and induced to enter the transactions, including by presenting the transaction as a beneficial "consolidation" solution while the economic reality was an unaffordable, fee-laden, absolutely repayable obligation.

103.    As per their own website, "Today's Advance is a financial funding firm that offers short term working capital solutions for businesses. We offer financial products to business owners based on their individual needs and qualification. Our Network of over 24 funders offer a variety of loans and other funding solutions to fit all your financial needs."

104.    Defendants shared a common purpose and financial incentives: the successful placement and funding of high-cost transactions that generated (i) upfront fees and deductions (including broker compensation and origination-type charges) and (ii) ongoing collections through fixed remittances.

105.    Today's Advance's commission-based compensation was tied to closing the transaction, aligning its interests with Lendbug's collection interests rather than with the merchant's financial interests.

106.    The Enterprise engaged in interstate commerce and used the instrumentalities of interstate commerce, including emails, telephone communications, electronic signature platforms, wire transfers, and ACH debits to solicit, contract, fund, and collect the unlawful obligations.

107.    The debt Defendants sought to collect constitutes "unlawful debt" within the meaning of 18 U.S.C. § 1961(6) because it was incurred in connection with Defendants' business of lending money in substance; it is unenforceable in whole or in part under New York law (including, at minimum, criminal usury principles applicable to disguised loans); and the interest/charges exceeded at least twice the maximum enforceable rate.

108.    Defendants' conduct also involved repeated uses of interstate wires in furtherance of a deceptive scheme to mischaracterize the transaction's true nature, cost, and consequences (including the "consolidation" pitch and the disguising of a loan as a receivables purchase).

### FIRST CAUSE OF ACTION
**(RICO – 18 U.S.C. § 1962(c))**

109.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

110.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

### The RICO Enterprise

111.    Defendants, through their coordinated conduct, jointly operated and managed an enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of an association-in-fact of individuals and entities engaged in a shared purpose: the deceptive and fraudulent extension, enforcement, and collection of unlawful merchant cash advances.

112.    The enterprise had an ongoing structure and continuity, including but not limited to shared funding sources, similar contract templates, coordinated enforcement practices, and a network of communications used to further the scheme.

113.    Defendants functioned as a unit, with each participant playing a specific role in the common course of conduct designed to defraud merchants and circumvent usury laws.

## RICO PREDICATE ACTS

114.    Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5), including:

      a.      Extortion under the Hobbs Act, 18 U.S.C. § 1951;

      b.      Collection of Unlawful Debt, 18 U.S.C. § 1961(6);

      c.      Wire Fraud, 18 U.S.C. § 1343;

123.    (Wire Fraud Particulars – 18 U.S.C. § 1343). Defendants devised and intended to execute a scheme to defraud merchants, including Plaintiffs, by inducing them to enter transactions documented as "purchases of future receivables" but structured and enforced as absolutely repayable, fee-laden loans with usurious and unconscionable effective rates.

### The Lendbug Loans

124.    Starting in or about April 2025, Today's Advance (acting as an MCA broker/ISO) solicited and communicated to Greene Turtle to pitch numerous Lendbug Loans.

125.    On or about April 16, 2025, Lendbug, including through Meiri and/or at his direction and/or through agents acting for Lendbug, transmitted and caused to be transmitted from New York by interstate electronic means the key transaction terms and documentation, including the Merchant Agreement and Offer Summary for the first Lendbug loan.  The Loan had an interest rate disclosed on its face of at least 139%.

126.    On or about May 9, 2025, Lendbug, including through Meiri and/or at his direction and/or through agents acting for Lendbug, transmitted and caused to be transmitted from New York by interstate electronic means the key transaction terms and documentation, including the Merchant Agreement and Offer Summary for the second Lendbug loan. The Loan had an interest rate disclosed on its face of at least 334%.

127.    On or about June 23, 2025, Lendbug, including through Meiri and/or at his direction and/or through agents acting for Lendbug, transmitted and caused to be transmitted from New York by interstate electronic means the key transaction terms and documentation, including the Merchant Agreement and Offer Summary for the third Lendbug loan. The Loan had an interest rate disclosed on its face of at least 161%.

128.    On or about July 23, 2025, Lendbug, including through Meiri and/or at his direction and/or through agents acting for Lendbug, transmitted and caused to be transmitted from New York by interstate electronic means the key transaction terms and documentation, including the Merchant Agreement and Offer Summary for the fourth Lendbug loan. The Loan had an interest rate disclosed on its face of at least 425%.

129.    On or about August 27, 2025, Lendbug, including through Meiri and/or at his direction and/or through agents acting for Lendbug, transmitted and caused to be transmitted from New York by interstate electronic means the key transaction terms and documentation, including the Merchant Agreement and Offer Summary for the fifth Lendbug loan. The Loan had an interest rate disclosed on its face of at least 200%.

130.    On or about October 2, 2025, Lendbug, including through Meiri and/or at his direction and/or through agents acting for Lendbug, transmitted and caused to be transmitted from New York by interstate electronic means the key transaction terms and documentation, including the Merchant Agreement and Offer Summary for the sixth Lendbug loan. The Loan had an interest rate disclosed on its face of at least 325%.

131.    On or about October 10, 2025, Lendbug, including through Meiri and/or at his direction and/or through agents acting for Lendbug, transmitted and caused to be transmitted from New York by interstate electronic means the key transaction terms and documentation,

including the Merchant Agreement and Offer Summary for the second Lendbug loan. The Loan

had an interest rate disclosed on its face of at least 325%.

132.    On or about October 16, 2025, Lendbug, including through Meiri and/or at his

direction and/or through agents acting for Lendbug, transmitted and caused to be transmitted

from New York by interstate electronic means the key transaction terms and documentation,

including the Merchant Agreement and Offer Summary for the second Lendbug loan. The Loan

had an interest rate disclosed on its face of at least 344%.

133.    Plaintiffs executed the transaction documents from Maryland through electronic

means, and these transmissions and the use of electronic execution platforms and

email/telephone communications were material to consummating the transaction and

implementing the scheduled remittance and enforcement structure.

134.    Defendants further used interstate wires and electronic banking systems to carry

out the scheme by transmitting funds for the transaction by electronic transfer and then initiating

and processing repeated electronic withdrawals from Defendants' New York bank account(s) to

collect fixed remittances, including ACH debits.

135.    The interstate wire communications and electronic withdrawals were used not

only to induce Plaintiffs to enter the transaction, but also to service and collect upon the unlawful

obligation through fixed remittances and default-driven enforcement mechanisms inconsistent

with a true receivables purchase.

136.    Plaintiffs relied on Defendants' deceptive pitch and documentation by proceeding

with the transaction, and Plaintiffs suffered damages as a direct and proximate result, including

excessive fees and collections and downstream banking harm Greene Turtle as alleged herein.

**A.      The Lendbug Culpable Persons**

130.    Amir Meiri is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

131.    Meiri is the Managing Member of Lendbug, LLC, which upon information and belief has less than five employees.

132.    Steele is a "person" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that he is an individual capable of holding a legal interest in property.

133.    Steele is the individual owner of Today's Advance and upon information and belief, conducted and participated, directly and indirectly, in the affairs of the Enterprise through his role in soliciting Plaintiffs, transmitting and/or causing the transmission of deal terms and documents, and obtaining fees and payments in connection with the unlawful transaction described herein.

**B.      The Lendbug Enterprise**

134.    Defendants Meiri, Lendbug and Today's Advance constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

135.    The Enterprise is associated-in-fact through ongoing business relationships, contractual arrangements, and coordinated conduct for the common purpose of carrying on an ongoing unlawful enterprise.

136.    Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

137.    It is believed since April 2024 and continuing through to the present, the members of the Enterprise have had ongoing relations with each other through common

control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

138.    The Enterprise consists of at least the following entities: Lendbug, LLC, Today's Advance, Amir Meiri, and Steele.

139.    The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40 and Conn. Gen. Stat. § 37-4.

140.    The Enterprise's conduct included repeated uses of interstate wires and electronic banking systems as described in the Loan Agreements, including emails, electronic execution of transaction documents, wire transfers, and ACH debits in furtherance of the scheme.

141.    Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**C.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Lendbug Enterprise**

142.    The RICO Persons have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit, in order to accomplish the common goals and purposes of collecting unlawful debts including as follows:

**i.    The Lendbug Enterprise Principals: Amir Meiri and David Steele**

143.    Meiri is a Managing Member of the Enterprise.

144.    He is responsible for the day-to-day operations and success of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

145.    In his capacity principal, Meiri is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the weekly payments via ACH withdrawals; and (iii) the form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.

146.    All such forms were used to make and collect unlawful loans including, without limitation, loans extended to Plaintiffs.

147.    As Managing Member, Meiri took actions and coordinated, caused, and directed other enterprise associates in furtherance of the overall goals and purposes of the Enterprise, including, but not limited to the origination, servicing, and unlawful collection of MCA Agreements, the overcollection of funds and exorbitant fees from Plaintiffs account.

148.    Steele is responsible for soliciting borrowers for the Enterprise, negotiating terms, and assisting with collecting upon the unlawful debt.

149.    Meiri and Steele have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the other Enterprise members.

**ii.    The Lendbug Enterprise MCA Companies: Today's Advance and Lendbug**

150.    Lendbug, LLC and Today's Advance maintain officers, books, records, and bank accounts independent of the other Enterprise members ("the Enterprise MCA Companies").

151.    The Principals have operated the Enterprise MCA Companies as part of an unlawful enterprise to collect upon unlawful debt and to engage in racketeering activity, including the repeated use of interstate wires and electronic banking systems as described herein.

152.    Pursuant to their membership in the Enterprise, the Enterprise MCA Companies have: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's fraudulent and usurious loan transactions, and participation agreements with Investors to fund such loans; (ii) pooled the funds of Investors in order to fund each fraudulent, usurious loan; (iii) underwritten the fraudulent and usurious loans, determining the ultimate rate of interest and repayment structure under each; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the fraudulent and usurious loans; (vi) set up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (vii) obtained judgments and settlements in its name to further collect upon the unlawful debt.

**E.    Interstate Commerce**

130.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

131.    Specifically, members of the Enterprise maintain offices in Florida and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities in New York, and throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

132.    In the present case, all communications between the members of the Enterprise were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.

133.    Specifically, the Enterprises used interstate emails to originate, underwrite, service and collect upon the agreements, fund the advances under each of the agreements and collect the payments via interstate electronic ACH debits.

134.    In addition, at the direction of Meiri, each of the agreements were executed in the State of New York, by Defendants, at their offices in New York.

**F.    Injury and Causation**

135.    Plaintiffs have been and will continue to be injured in their business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c), including through the collection of unlawful debt and the pattern of racketeering activity alleged herein, in an amount to be determined at trial.

136.    Such injuries include, without limitation, improper fees and upfront deductions, amounts collected through the remittance/ACH structure, associated bank fees and operational dislocations, and other business losses to be proven at trial.

137.    Plaintiff Green Turtle was forced to make weekly payments pursuant to the MCA Agreements that amounted to unconscionable interest rates.

138.    Under controlling New York law, the MCA Agreements are void ab initio.  *See Adar Bays, LLC v. GeneSYS ID, Inc*., 2021 WL 4777289 (N.Y. Oct. 14, 2021).

139.    Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

140.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy to Violate RICO – 18 U.S.C. § 1962(d))

162.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

163.    Defendants knowingly agreed that a conspirator would conduct or participate in the affairs of the Enterprise through a pattern of racketeering activity and/or the collection of unlawful debt, and Defendants knowingly joined and participated in that agreement, in violation of 18 U.S.C. § 1962(d).

164.    Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs to collect upon unlawful debts, including the Agreement, thereby agreeing to violate 18 U.S.C. § 1962(c).

165.    Each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the Agreements.

166.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through the use of interstate wires and electronic banking systems, including emails, telephone communications, electronic signature platforms, wire transfers, and ACH debits, to solicit, document, fund, service, and collect the unlawful obligations, including the Agreement.

167.    The participation and agreement of Defendants and each Enterprise Member was necessary to allow the commission of this scheme.

168.    Plaintiffs have been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

169.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments and lost profits.

170.    Plaintiffs were forced to make weekly payments pursuant to the MCA Agreements that amounted to unconscionable interest rates.

171.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

172.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

### THIRD CAUSE OF ACTION
**(Declaratory Judgment – 28 U.S.C. § 2201)**
**(Against Defendant Lendbug Only)**

173.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

174.    An actual, present, and justiciable controversy exists between Plaintiffs and Lendbug concerning the rights and obligations under the Agreements, including Lendbug's claimed right to enforce and collect under a transaction that Plaintiffs contend is void and unenforceable.

175.    As a direct result, Plainfiffs seek a declaration that the UCC liens are not enforceable and void.  *See Div. 5, LLC v. Fora Fin. Advance, LLC*, 2024 U.S. Dist. LEXIS 200191, *15-16, 2024 LX 92102, 2024 WL 4663042 ("Allowing  Division 5 to use the criminal usury law to void Fora's UCC liens fits well with this statutory scheme. Division 5

has not sought to invalidate the underlying MCA agreement or to recover already-paid interest. Rather, it wants to protect itself from future efforts to collect an illegal debt through the statutory mechanism of UCC lien letters. While, strictly speaking, a UCC lien is not a legal action, it accomplishes the same end while allowing the issuer to bypass the courts. To condone such practices would create the very kind of loophole that the New York legislature sought to eliminate. Division 5 has therefore at least raised a legitimate question as to whether the Court can issue its requested declaratory judgment.").

176.    Plaintiffs seek a declaration that the Agreement is a disguised loan, not a true sale of receivables, and is unenforceable because it is procedurally and substantively unconscionable, and because it was structured to evade New York's usury and lending laws through mislabeling and oppressive terms.

177.    Plaintiffs further seek a declaration that, because the receivables purportedly "purchased" had already been sold/encumbered to numerous other MCA companies at the time of contracting (a fact known to Defendants), the "purchase" characterization is commercially and legally false, further confirming the transaction's illegality and unenforceability.

178.    Plaintiffs request declaratory and related relief, including (a) a declaration that the Agreement is void and unenforceable, (b) a declaration that Lendbug has no right to collect amounts beyond any lawful recovery (if any), (c) an order directing termination/release of any UCC lien or security interest filed or maintained in connection with the Agreement, and (d) such further relief as the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### (Negligence and Breach of Fiduciary Duty)
### (Against Defendants Today's Advance and Steele Only)

179.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

180.    Defendants were in a unique position of trust and owed Plaintiffs a fiduciary duty.

181.    Defendants held themselves out as an advisor acting in Plaintiffs' best interests

182.    Defendants acted with gross negligence and in reckless disregard of Plaintiffs' rights by inducing Plaintiffs to enter into a knowingly criminally usurious loans with Lendbug.

183.    Defendants knew that Plaintiffs had already entered into other MCA agreements.

184.    Defendants, an experienced MCA broker, knew or should have known that each of those MCA agreements contained anti-stacking clauses prohibiting Plaintiffs from further encumbering their receivables or entering into additional MCA agreements.

185.    Defendants further knew or should have known that the transaction was a disguised loan in violation of New York usury laws.  Among other things, the loan disclosed interest rates in excess of 400% on their face, and openly charged finance charges and retained upfront prepaid finance fees that increased the actual interest rate beyond 400%.

186.    Defendants further knew or should have known that it placed Plaintiffs in default from day one by breaching various representations and warranties that Plaintiffs knew would be invoked by the lender if they missed a payment.

187.    Defendants placed their own financial interest above Plaintiffs by not disclosing these risks.

188.    Defendants further failed to disclose that they received a higher commission in the event that it was able to induce Plaintiffs into paying a higher interest rate.  In other words, Defendants failed to disclose that it made more of Plaintiffs paid more.

189.    As a direct result of Defendants' breach of its fiduciary duties and duty of care, Plaintiff entered into the Lendbug Loans, which have caused substantial harm to Plaintiffs.

190.    Defendants undertook to advise, broker, and recommend financing to Plaintiffs, including recommending and arranging the Lendbug transactions as a purported "consolidation" solution.

191.    In doing so, Defendants owed Plaintiffs a duty to exercise reasonable care and competence under the circumstances, including to avoid steering Plaintiffs into a transaction that Defendants knew or should have known was predatory.

192.    Defendants breached its duty, including by:

   a.    Recommending and brokering a transaction with an illegal interest rate and massive hidden/upfront charges;

   b.    Failing to adequately disclose and explain the true economic reality of the transaction as a loan with fixed repayment pressure and default-driven coercion;

   c.    Collecting substantial broker compensation in connection with a deal that was contrary to Plaintiffs' interests, without reasonable safeguards, diligence, or warnings;

   d.    Steering a merchant into a structure that was predictably unsustainable.

193.    Defendants' negligence was a direct and proximate cause of Plaintiffs' damages, including amounts paid in excess of amounts received (including upfront broker and origination charges).

194.    Plaintiffs are entitled to recover compensatory damages in an amount to be determined at trial, plus such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against all Defendants, jointly and severally, and grant the following relief:

i.    On the First Cause of Action, awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c), plus attorneys' fees and costs;

ii.    On the Second Cause of Action, awarding Plaintiffs treble damages pursuant to 18 U.S.C. § 1964(c), plus attorneys' fees and costs;

iii.    On the Third Cause of Action, entering declaratory relief that the Agreement is void and unenforceable, and granting related relief including release/termination of any security interest or UCC filing tied to the Agreement;

iv.    On the Fourth Cause of Action, awarding Plaintiffs compensatory and punitive damages against Steele and Today's Advance in an amount to be determined at trial;

v.    Awarding pre- and post-judgment interest as permitted by law; and

vi.    Awarding such other and further relief as the Court deems just and proper.

Dated: New York, New York
　　　December 23, 2025

HESKIN & PROPER, PLLC

By: /s/ Shane R. Heskin
Shane R. Heskin
641 Lexington Avenue, 14th Floor
New York, New York 10022
shane@heskinproper.com
Attorney for Plaintiffs